Holgate Bros. Co. et al. *v.* Bashore et al., Appellants.

Miller *v.* Bashore et al., Appellants.

256

Argued May 23, 1938. Before KEPHART, C. J., SCHAF-FER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Alexander H. Frey* and *Guy K. Bard,* Attorney General, with them *William H. Wood,* Special Deputy Attorney General, and *Gilbert J. Kraus,* for appellants.

*Gilbert Nurick* and *Thomas Raeburn White,* with them *Richard C. Bull, Henry C. McGrath, Harold D. Saylor, Sterling G. McNees, Joseph P. Gaffney, Harold B. Beitler, Ira Jewell Williams* and *James H. Booser,* for appellees, in No. 36.

*Willis F. Daniels* and *Rose Daniels,* for appellee, in No. 28.

OPINION BY MR. JUSTICE DREW, June 30, 1938:

From the decrees of the Court of Common Pleas of Dauphin County declaring unconstitutional, illegal and void, the General 44-Hour Week Law (Act of July 2, 1937, P. L. 2766), in the above entitled cases, the defendants took these appeals.

The case of Holgate Bros. Co. et al., including the five cases consolidated therewith in the court below, is an appeal by the defendants, Ralph M. Bashore, Secretary of Labor and Industry, and the members of the Industrial Board of the Commonwealth of Pennsylvania, from a decree of the lower court restraining them from enforcing any of the provisions of the 44-Hour Week Law with respect to the plaintiffs. The other case considered here is that of C. W. Miller, a taxpayer, against the same defendants, in which the lower court granted a preliminary injunction, subsequently made permanent, restraining the defendants from enforcing any of the provisions of the 44-Hour Week Law. From these actions defendants appealed.

While these cases were pending in the court below, more than 700 persons and corporations, all employers of labor, were permitted to intervene as parties plaintiff, all of them raising the same questions; certain labor organizations were permitted to intervene on behalf of the defendants. The formal adjudication in each case contains findings of fact and conclusions of law in keeping with the decree entered. The legal conclusions upon which the adjudication was based were that the 44-Hour

Week Law was an improper exercise of the police power, and that Section 2(b) thereof delegated legislative power and incorporated Federal regulations by reference in violation of the Constitution of Pennsylvania. The findings of fact are to the general effect that the operation of the 44-Hour Week Law would cause difficulties of management and production for the respective plaintiffs, would greatly increase their labor and overhead costs, would increase the selling price of their products and greatly reduce their profits, and would seriously prejudice their ability to compete in the sale of their goods in states which have no similar laws. It was also found as a fact that the work performed by the employees of the respective plaintiffs under the existing schedule of hours is not in any way injurious or detrimental to their health, morals, safety or welfare; and that in some instances the terms of the 44-Hour Week Law will result in a reduction of the weekly wages of the employees since they are paid on an hourly or piecework basis.

The 44-Hour Week Law, which affects nearly all the male workers in the Commonwealth of Pennsylvania, is in terms simple. The title states its purpose to be ". . . to protect the public health and welfare by regulating employment in this Commonwealth with respect to hours and conditions of employment." Section 2, the heart of the act, provides that ". . . no employer shall employ any person for more than forty-four hours in any one week, or eight hours in any one day, or on more than five and one-half days in any period of seven consecutive days." Section 2(c) exempts those engaged in agricultural occupations, or in domestic service in private homes, or persons doing executive work and earning more than twenty-five dollars a week, and the learned professions. Section 2(b), however, provides that "Where the strict application of the schedule of hours provided for by this section, imposes an unnecessary hardship and violates the intent and purpose of

this act, the Department of Labor and Industry, with the approval of the Industrial Board, may make, alter, amend and repeal general rules and regulations prescribing variations from said schedule of hours; Provided, That with respect to any industry whose schedule of hours is established by Federal regulation, the schedule to be fixed by the Department of Labor and Industry, with the approval of the Industrial Board, shall conform to the schedule established by any such Federal regulatory body." The delegation of these broad powers to the Department and the Board, as well as to Federal authority, was regarded by the legislature as so vital to the operation of the act that it provided in Section 11 ". . . that the provisions of subsection (b) of section two are hereby declared not to be severable from the other provisions of this act, and in the event the provisions of such subsection are held to be unconstitutional, it is hereby declared that the legislative intent is that the entire provisions of this act shall not be in force or effect." Consequently, we are impliedly invited at the outset to determine the validity of Section 2(b). The court below held it invalid.

The well recognized prohibition against the delegation of legislative power is a necessary outgrowth of the fundamental theory of the separation of governmental functions which permeates our State and Federal Constitutions alike. Article II, Section 1, of the Constitution of Pennsylvania provides: "The legislative power of this Commonwealth shall be vested in a General Assembly which shall consist of a Senate and a House of Representatives." Article I, Section 1, of the Constitution of the United States provides: "All legislative power herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

It is safe to assume, therefore, that the type of delegation of power by a legislative body which is invalid under the one Constitution is also invalid under the

other, and that reliance may be placed upon such decisions arising under the Constitution of the United States in construing the Constitution of Pennsylvania. The validity of these assumptions has in fact been recognized in the recent case of *Gima v. Hudson Coal Co.*, 310 Pa. 480.

Legislative power in Pennsylvania is vested solely in the General Assembly. Regardless of exigencies which at times arise or of how trying our economic or social conditions become, the powers and duties imposed by the Constitution upon the legislative branch of our government remain steadfast and neither the urgency of the necessity at hand nor the gravity of the situation allow the legislature to abdicate, transfer or delegate its authority or duty to another branch of the government. Our system of checks and balances in the government was wisely instituted by the framers of the Constitution for the protection of all the people of the Commonwealth and has proved an effective method to prevent unwise, hasty and imprudent legislation. So effective has been this system of government no attempt has been made to amend that part of the Constitution and it remains the fundamental law of this Commonwealth.

The legislature may, however, leave to administrative officers, boards and commissions, the duty to determine whether the facts exist to which the law is itself restricted. In all such occasions, nevertheless, the legislative body must surround such authority with definite standards, policies and limitations to which such administrative officers, boards or commissions, must strictly adhere and by which they are strictly governed. As said by Mr. Justice AGNEW, in *Locke's Appeal*, 72 Pa. 491, 498, "Then, the true distinction, I conceive, is this: The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend." Thus the legislature may, as was held in *Locke's Appeal*, pass

laws to become effective only upon local option. The ascertained sentiment of the locality is the fact upon which the law is to become operative; the local sentiment does not make the law, and it is just as proper to have it determined after as before the legislature acts. So also the legislature may confer upon an executive department or other agency the power to find whether the facts exist upon which a law is to operate. Generally these facts are of a scientific nature, not involving a personal decision as to whether the facts should be considered within the general policy of the law in question. Thus it has been held valid for the legislature to provide that the use of explosives in mines shall be regulated by the rules adopted by the manufacturer of the explosives *(Gima v. Hudson Coal Co.,* supra), to empower the Department of Agriculture to determine what animal diseases are communicable *(Com. v. Falk,* 59 Pa. Superior Ct. 217), to adopt as standards of purity for drugs the formulæ of the United States Pharmacopoeia *(Com. v. Sweeney,* 61 Pa. Superior Ct. 367), to authorize an administrative official to fix uniform standards of purity for tea imported *(Buttfield v. Stranahan,* 192 U. S. 470), to determine whether certain bridges obstruct navigation *(Union Bridge Company v. U. S.,* 204 U. S. 364), to establish standards of purity and safety for illuminating oil *(Red "C" Oil Mfg. Co. v. Board of Agriculture of North Carolina,* 222 U. S. 380), to ascertain the number of policemen and firemen necessary to protect the public assembled in large crowds at public games and exhibitions *(American Baseball Club v. Phila.,* 312 Pa. 311).

There is another class of cases in which the fact left for future determination is not one conforming in any degree to scientific standard as in those just reviewed. These are cases in which primary standards are established and the duty delegated to make the policy of the legislature effective. In *Panama Refining Company v. Ryan,* 293 U. S. 388, 426, Chief Justice HUGHES, refer-

ring to this class of cases, said: "Moreover, the Congress may not only give such authorizations to determine specific facts but may establish primary standards, devolving upon others the duty to carry out the declared legislative policy, that is, as Chief Justice MARSHALL expressed it 'to fill up the details' under the general provisions made by the legislature." In *J. W. Hampton, Jr., & Co. v. United States,* 276 U. S. 394, considering a delegation of power to fix tariffs subject to certain rules or standards, the court said (p. 409) : "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power."

It was upon this principle our legislature created the Public Service Commission and the Milk Control Board: *Rohrer v. Milk Control Board,* 322 Pa. 257. In each statute (Act of July 26, 1913, P. L. 1374; Act of January 2, 1934, P. L. 174, as amended by the Act of April 30, 1935, P. L. 96) definite procedure is outlined which must be followed by those administering the law, definite standards are fixed by which utility rates and milk prices are to be arrived at, factors are enumerated which are to be considered as bearing upon reasonable rates and prices, and it is provided that action can be taken only after a hearing, which must be supported by findings of fact and formal reasons. And the action taken is subject to judicial review to determine whether the facts found bring the case within the standards prescribed by the legislature. As to the rule making power of these tribunals, a matter apart from their power to fix prices and rates, their action is likewise strictly confined by legislative limits.

It is absolutely essential that limits be set on the power conferred on such tribunals and that the scope of their authorized action clearly appear. "In creating such an administrative agency the legislature, to prevent its being a pure delegation of legislative power,

must enjoin upon it a certain course of procedure and certain rules of decision in the performance of its function. It is a wholesome and necessary principle that such an agency must pursue the procedure and rules enjoined and show a substantial compliance therewith to give validity to its action": *Wichita Railroad & Light Company v. Public Utilities Commission*, 260 U. S. 48, 59. If the legislature fails, however, to prescribe with reasonable clarity the limits of the power delegated or if those limits are too broad its attempt to delegate is a nullity: *Schechter Poultry Corp. v. United States*, 295 U. S. 495; *Panama Refining Co. v. Ryan*, supra; *O'Neil v. Insurance Co.*, 166 Pa. 72.

Applying these principles to the instant cases we are forced to conclude that Section 2(b) of the 44-Hour Week Law offends the Constitution of Pennsylvania in two distinct and incorrigible particulars. First, it delegates to the Department of Labor and Industry in conjunction with the Industrial Board the power to make law for the regulation of the hours of labor. Second, it attempts to hand over to Federal authority—whether Congress, executive commission, or other agency not yet appearing—plenary power to regulate working hours in Pennsylvania. As to the delegation to the Department of Labor and Industry, the only condition precedent to the exercise of this extraordinary power to change the provisions of the statute and make its own law is expressed in the following words: "Where the strict application of the schedule of hours provided for by this section, imposes an unnecessary hardship and violates the intent and purpose of this act. . . ." If this condition is found to exist, the statute provides no limit to the exercise of the discretion of the Department with the approval of the Industrial Board to prescribe variations from the schedule of hours laid down in the act. This may be done by means of general rules and regulations which may be made, altered, amended and repealed at discretion. The Department is then free to

fix the hours of labor in any industry, group of industries, or in individual cases, without any guide or restraint of any kind; the hours may be shortened to six a day or extended to ten or twelve a day. There is no policy set up, there are no standards, there are no boundaries within which the Department and the Board must exercise their discretion. There are no requirements for hearings, findings of fact with reasons for conclusions, or appeals. There is merely a naked authority given to the Department and the Board to make law by general rules and regulations prescribing variations from the said schedule of hours, and to alter, amend or repeal such rules and regulations. The power to amend or repeal a statute is as much legislative in nature as the power to enact the statute. It is impossible to find any restrictive policy in such a grant.

As the court below said, "Under this section the department, with the approval of the board, may provide a maximum work-week of any number of hours in excess of forty-four, and a maximum work-day in excess of eight hours as to any industry or employees or as to all industries or to all employees. The action of the legislature prescribing a maximum work-week of forty-four hours and a maximum work-day of eight hours might be completely nullified or partially or entirely rewritten by the regulation of the department. The law then would be not what the legislature prescribed, but what the department deemed proper.

"Furthermore, such variations might be made upon such conditions as the department might see fit to impose. The best illustration of the conditions which might be attached to the variations is found in the variations heretofore granted. Under the rules promulgated by the department and approved by the Industrial Board, employers of less than three persons may permit their employees to work nine hours per day and fifty-four hours per week. Secretaries earning over $25 per week and employed by exempt executives are entirely exempt

from the act. Employers working on a five-day-per-week basis may employ persons to work ten hours per day, but not more than forty-four hours per week. Watchmen, janitors, stationary engineers, firemen, boilermen, and furnacemen may work any number of hours per day but not more than forty-eight per week. Persons employed in the canning industry may work unlimited hours during the canning season, and employees in the hotel and restaurant industries are permitted a thirteen-hour day and a forty-eight-hour week."

In *Schechter Poultry Corp. v. United States,* supra, the National Industrial Recovery Act was held to be unconstitutional on the ground that the code-making authority therein conferred was an unconstitutional delegation of legislative authority. Chief Justice Hughes there stated (p. 541) : "Section 3 of the Recovery Act is without precedent. It supplies no standards for any trade, industry or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them. For that legislative undertaking, Section 3 sets up no standards, aside from the statement of the general aims of rehabilitation, correction, and expansion described in section one. In view of the scope of that broad declaration, and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered." The same criticism applies to Section 2(b) of the 44-Hour Act. It supplies no standards for any trade, industry, or activity, and does not undertake to prescribe rules of conduct to be applied to particular states of fact to be determined by any administrative procedure. The statement of the general aim of the act ". . . to protect the public health and welfare" is as broad in scope as the general aim of re-

habilitation, correction, and expansion described in the National Industrial Recovery Act.

In the case of *Panama Refining Company v. Ryan,* supra, a less sweeping authority given to the President by Congress was in question and the Court held the delegation to be an unlawful one, in violation of the Constitution of the United States. In that case the President was given the authority to prohibit the transportation in interstate and foreign commerce of petroleum and petroleum products produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any state law or valid regulation or order prescribed under any state law. Mr. Chief Justice HUGHES delivered the opinion of the court, which, in part, is as follows (p. 415), "Section 9(c) is brief and unambiguous. It does not attempt to control the production of petroleum and petroleum products within a State. It does not seek to lay down rules for the guidance of state legislatures or state officers. It leaves to the States and to their constituted authorities the determination of what production shall be permitted. It does not qualify the President's authority by reference to the basis, or extent, of the State's limitation of production. Section 9(c) does not state whether, or in what circumstances or under what conditions, the President is to prohibit the transportation of the amount of petroleum or petroleum products produced in excess of the State's permission. It establishes no criterion to govern the President's course. It does not require any finding by the President as a condition of his action. The Congress in Section 9(c) thus declares no policy as to the transportation of the excess production. So far as this action is concerned, it gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit. And disobedience to his order is made a crime punishable by fine and imprisonment."

The Court of Appeals of New York, in *People v. C. Klinck Packing Company*, 214 N. Y. 121, held unconstitutional a provision in a law requiring one day of rest in every seven consecutive days for workers in factories and mercantile establishments, which authorized the Commissioner of Labor to exempt from its provisions employees engaged in continuous processes if he ". . . in his discretion approves." The court said (pp. 138-139) : "The question whether the statute shall take effect in any, all, or no cases is left wholly to his [the Commissioner's] volition. Under its terms he has the power, without check or guidance, so far as we can perceive, to veto the entire clause and decide that its benefits shall never be extended to any case although it comes within the precise terms of the statute, or to permit the exemption in one case and deny it in another precisely similar one. Of course, it is not to be assumed that the commissioner of labor would intentionally be arbitrary and unreasonable in the exercise of this power, but nevertheless the legislature has attempted to confer upon him the opportunity which would permit of these shortcomings and we are to judge of a statute by what is possible under it. In the absence of any guide it might very well happen that an administrative officer with the best of purposes would nevertheless be very fallible in the execution of them."

In *O'Neil v. Insurance Company*, supra, this Court declared an act of the legislature an unlawful delegation of legislative power. The statute in question in that case directed the Insurance Commissioner to prescribe a standard policy of insurance and forbid the use of any other. We declared the act to be unconstitutional and said (p. 79) : "The elementary books divide a statute into three parts, the declaratory, the directory and the vindicatory. In this statute the legislature furnished the first and third. It delegated the preparation of the second. It declared in effect the need of a standard form of policy. It provided punishment for the failure to use

such form when provided; but it turned the preparation of the form over to its appointee and gave him six months in which to do his work and file a copy of it in his own office. Whoever might be interested in knowing the directory part of the statute and understanding what it was he was required to do, had to go beyond the act of assembly and inquire of the appointee of the legislature what it was he had filed in his own office, of which the people of the Commonwealth were bound to take notice at their peril. . . .

"We do not see how a case could be stated that would show a more complete and unconstitutional surrender of the legislative function to an appointee than that presented by the Act of 1891. By its provisions the legislature says in effect to its appointee, 'Prepare just such a policy or contract as you please. We do not care to know what it is. The governor shall have no opportunity to veto it. File it in your own office and we will compel its adoption, whether it is right or wrong, by the punishment of every company officer or agent who hesitates to use it.' "

Even more palpably violative of the Constitution is the provision of Section 2(b) that ". . . with respect to any industry whose schedule of hours is established by Federal regulation, the schedule to be fixed by the Department of Labor and Industry, with the approval of the Industrial Board, shall conform to the schedule established by any such Federal regulatory body." Whatever the Federal schedule, now or hereafter adopted may be, the Pennsylvania schedule "shall conform." There is no escape from the conclusion that this language is mandatory. The result would be, if the proviso is effective, that whenever a Federal regulatory body established a schedule of hours for any industry, our Department of Labor and Industry is bound to adopt such schedule of hours for that industry. This would, of course, introduce an inequality in the requirement for hours of labor in Pennsylvania. There is no

pretense that the Federal schedule will be limited by any standard. In this attempted transfer of legislative power there is not even a semblance of limitation or control. A more sweeping abdication of power and duty it would be difficult to imagine.

This case has no resemblance to *Commonwealth v. Alderman,* 275 Pa. 483, relied upon by the Commonwealth. There, the Pennsylvania liquor prohibition act referred to the Federal act for the definition of intoxicating liquor. Under national prohibition the state acts were merely augmentative. The national act, passed pursuant to the Eighteenth Amendment, applied to everyone whether the states had their own acts or not. Consequently, all involved in the *Alderman* case was a deference to the superior authority of the Federal law. We held there was not a delegation of power but a simple acknowledgment by the legislature of the power of Congress under a constitutional amendment. But as to hours of labor the Federal government cannot regulate beyond the field of interstate commerce. Beyond that lies the exclusive province of the states. Therefore, when the present act requires the hours schedules of the Department to conform to those of some Federal authority it is to that extent delegating its exclusive power to the Federal government.

For the foregoing reasons we are firmly convinced that Section 2(b) of the 44-Hour Week Law is invalid, and, in view of the expressed intention of the legislature in section 11, the whole act must fall. It is, therefore, unnecessary to pass upon other questions raised in these cases.

The assignments of error are overruled. The decrees of the lower court are affirmed at appellants' cost.